LESLIE K. WILD, APPELLEE, V.
BRIAN P. WILD, APPELLANT.
737 N.W.2d 882

Filed July 10, 2007. No. A-06-877.

Stephanie Weber Milone for appellant.

Carll J. Kretsinger, P.C., and Ronald E. Reagan for appellee.

IRWIN, CARLSON, and MOORE, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Prior to the current appeal, in *Wild v. Wild*, 13 Neb. App. 495, 696 N.W.2d 886 (2005) (*Wild I*), we were presented with Brian P. Wild's appeal from an order of the district court which granted Leslie K. Wild's prior complaint for permanent removal of the parties' minor child, Amber Lynn Wild, to Ohio; in that case, we reversed the order upon finding that the district court abused its discretion in finding that Leslie satisfied her burden of proof with respect to both demonstrating a legitimate reason for removal and showing that removal is in Amber's best

interests. Our mandate in the prior appeal was issued on July 28, 2005, and the district court made a docket entry in conformance with the mandate on August 3. Leslie filed another request for removal of Amber to Ohio on August 5, and the district court again granted permanent removal. Brian appeals from this second order of the district court granting a request by Leslie for permanent removal of Amber from Nebraska to Ohio.

In the present appeal, Brian challenges the district court's grant of Leslie's request for temporary removal of Amber to Ohio pending trial on Leslie's request for permanent removal; the district court's grant of permanent removal again; the district court's findings concerning Brian's visitation rights, child support, and request for attorney fees; and the district court's denial of Brian's counterclaim for a change of custody. We disapprove of the district court's grant of temporary removal of Amber to Ohio. Upon our de novo review of the record, we find that the district court again abused its discretion in finding that Leslie satisfied her burden of proof with respect to both demonstrating a legitimate reason for removal and showing that removal is in Amber's best interests. As such, we again reverse that finding of the district court. We find no abuse of discretion by the district court concerning either Brian's request for a change of custody or his request for attorney fees, and we affirm those rulings of the district court.

## II. BACKGROUND

The background of this case is long and complicated. The history of the case involves three requests for permanent removal, trials on two such requests, one grant of temporary removal, two orders granting permanent removal, and one prior decision of this court reversing a grant of permanent removal. As such, in this section of our opinion, we will set forth the history of the first two requests for permanent removal, the district court's first order granting permanent removal, and our prior reversal of that order as the "History of *Wild I.*" We will set forth the history of the case following our opinion in *Wild I*, including Leslie's third request for permanent removal, trial on that request, and the district court's grant of that request, in the remaining subdivisions of this section.

## 1. History of *Wild I*

We recounted the relevant background of this case in our opinion in *Wild I*. As we noted in that opinion, Brian and Leslie were married on April 3, 1993. Brian was a member of the U.S. Air Force during the marriage, stationed at Offutt Air Force Base in Bellevue, Nebraska (Offutt), while Leslie was employed as a civil service employee working at Offutt. Amber was the only child born to the parties during the marriage, and her date of birth is October 12, 1994. The marriage was dissolved by a decree entered on February 20, 2003, which decree incorporated a "'settlement agreement to all issues presented to include custody, visitation and support.'" *Wild I*, 13 Neb. App. at 498, 696 N.W.2d at 891. Leslie was awarded custody, Brian was awarded visitation rights, and Brian was ordered to pay child support.

On October 7, 2003, Brian filed an application and affidavit for citation in contempt, alleging that Leslie had taken Amber to Idaho on vacation for one 8-day period and one 12-day period during the summer of 2003—during which periods Brian was supposed to have had visitation in accordance with the decree—despite Brian's notification to Leslie that he objected to Leslie's taking Amber. The district court ordered Leslie to appear and show cause why she should not be held in contempt for taking Amber to Idaho. The record presented to us did not reflect any further disposition of the application for contempt.

On November 7, 2003, approximately 8½ months after the decree was entered, Leslie filed her first request to permanently remove Amber from Nebraska. Leslie alleged that she faced uncertainty concerning her future employment at Offutt, that she had secured new employment in Ohio that would pay less than her existing employment at Offutt but would afford opportunities for upward mobility, that Ohio provided an opportunity for an improvement in housing, that the schools in Ohio would be "'equal to or better than'" Amber's school in Nebraska, that Amber desired to move to Ohio, and that removal would be in Amber's best interests. *Id.* at 499, 696 N.W.2d at 892. Leslie withdrew this first request for permanent removal

less than 2 weeks later, when her employment opportunity in Ohio was eliminated.

On April 23, 2004, Leslie filed a second request to permanently remove Amber from Nebraska. Leslie alleged that she had been offered and had accepted a position of employment to begin June 1 in Dayton, Ohio, which would provide a substantial increase in salary. At the trial on Leslie's second request to permanently remove Amber, Leslie testified that she had already moved to Ohio and that she had chosen to go to Ohio because of a relationship with a man who was described as her fiance, and because of rumors of uncertainty concerning her future employment at Offutt. *Id.* On July 21, the district court granted Leslie's second request to permanently remove Amber.

In our opinion in *Wild I*, we reversed the district court's grant of Leslie's second request to permanently remove Amber from Nebraska. We concluded first that the district court abused its discretion in finding that Leslie had carried her burden to demonstrate a legitimate reason for removal, because the evidence in the record failed to demonstrate that the new job Leslie had accepted—prior to seeking court approval to remove Amber and move to Ohio—provided a reasonable improvement in her career or an opportunity for career advancement. There was no evidence to indicate that the increase in salary would provide any benefit to the interests of Amber, especially when considering cost-of-living differences between Nebraska and Ohio and Leslie's responsibility to pay for transportation costs associated with bringing Amber back to Nebraska for visitation with Brian. There was also no evidence to indicate that the new employment provided any opportunity for career advancement.

In our opinion in *Wild I*, we also set forth in detail the relevant test for determining whether Leslie had demonstrated that removal was in Amber's best interests. We reviewed each factor individually, including each parent's motives for seeking or opposing removal, the eight considerations that constitute a determination of whether removal will enhance Amber's quality of life, and the impact of the move on the relationship between Amber and Brian. We concluded that nearly every factor and consideration did not weigh in favor of allowing removal, and

we concluded that the district court abused its discretion in finding that Leslie had sufficiently demonstrated that removal was in Amber's best interests.

We noted in *Wild I*, 13 Neb. App. at 518, 696 N.W.2d at 904, that "Leslie testified that if the court denied her request to remove Amber to Ohio, she would return to Nebraska." The mandate in *Wild I* was issued to the district court on July 28, 2005, and the district court made a docket entry in conformance with the mandate on August 3.

### 2. POST-*WILD I* PROCEDURAL BACKGROUND

On August 5, 2005, just 2 days after the district court made a docket entry in conformance with the mandate in *Wild I*, Leslie filed a third request to permanently remove Amber from Nebraska. Leslie alleged that "there ha[d] occurred a material and significant change in circumstances" since the time of the district court's prior grant of Leslie's second request to permanently remove Amber. Leslie alleged "said circumstances [to be], amongst other things," that Amber had attended school in Ohio during the 2004-05 school year and that such attendance was consistent with the now reversed grant of permanent removal ordered by the district court in *Wild I*; that the employer Leslie had worked for at Offutt prior to her previous requests for permanent removal had been "placed on the Department of Defense Base Closure list and [was] scheduled for relocation to another location outside the State of Nebraska"; that if Leslie would leave her employment in Ohio to return to her employment at Offutt, she "would be compelled to relocate with [her employer] to it's [sic] new location outside of the State of Nebraska"; that Amber's half sister, who had formerly been residing with Brian, was under the jurisdiction of the juvenile court and had been placed outside Brian's home; and that Amber was enrolled in a school in Ohio that operates on a traditional school year calendar and which meets Amber's educational needs. Leslie did not make any other allegations related to a legitimate reason for removal or related to Amber's best interests' being served by removal.

Also on August 5, 2005, Leslie filed a motion for temporary removal of Amber from Nebraska. In support of the request,

Leslie pointed to several matters, including the fact that the district court had previously granted Leslie's second request to permanently remove Amber, which grant was reversed by this court in *Wild I*; the fact that Leslie and Amber had moved to Ohio, again in accordance with the prior grant of permanent removal reversed by this court in *Wild I*; the fact that Leslie had accepted employment in Ohio and had received a raise in salary, apparently referring to the employment Leslie accepted in Ohio prior to even filing her second request for permanent removal that was at issue in *Wild I*; the fact that the mandate in *Wild I* reversing the district court's prior grant of permanent removal was not issued until July 28; and the fact that Leslie had already made living and school arrangements in Ohio. Additionally, Leslie alleged that to temporarily remove Amber to Ohio, "rather than have a temporary placement in Nebraska followed by a permanent move to the State of Ohio if [the] application [for permanent removal] is granted," was in Amber's best interests.

On September 16, 2005, Brian filed a response to Leslie's motion for temporary removal and, in the same filing, moved for enforcement of his visitation rights. Brian also filed an affidavit in support of his motion to enforce visitation. In that affidavit, Brian indicated that Leslie had taken physical custody of Amber on August 20 and had brought her back to Ohio; that he had sent a letter on August 29 demanding that Leslie return Amber to Nebraska in accordance with our opinion in *Wild I*; that his visitation rights, pursuant to the decree, included visitation every other weekend from Friday night until Sunday night, every Thursday overnight, and one evening every other week on either Monday or Tuesday; and that he had been afforded no physical contact with Amber since August 20.

On September 29, 2005, the district court entered an order ruling on Leslie's request for temporary removal of Amber and Brian's motion for enforcement of his visitation rights. The district court held in part:

> The Court having received the Decree and Modification thereto on the issue of visitation and the affidavit does not see any claim by [Brian] that he attempted to physically exercise his visitation and was refused by [Leslie]. The

visitation schedule does not require [Leslie] to transport [Amber] to [Brian].

Therefore the Motion to Enforce Visitation is denied.

The Court sustains the Motion for Temporary Removal and fixes the matter for trial on **NOVEMBER 16, 2005** at the hour of 9:00 a.m. in District Courtroom #1.

As such, the court denied Brian's request to enforce visitation rights guaranteed in the decree—the only operative visitation order then in effect—because Brian had not indicated an attempt to physically visit with Amber and because the visitation order did not require Leslie to provide transportation; the district court did not make any findings of what impact Leslie's removal of Amber to Ohio without court permission in August should have had on Brian's visitation rights, however. Additionally, the court sustained Leslie's motion for temporary removal, without explanation.

On October 7, 2005, Brian filed an answer and counterclaim. In his counterclaim, Brian requested that the court modify the decree and award custody of Amber to him.

On December 22, 2005, the district court entered an order continuing the scheduled trial in this matter, by stipulation of the parties. Pursuant to a stipulation of the parties, temporary custody of Amber was awarded to Brian, to commence on December 30.

### 3. Trial in Present Case

On June 20, 2006, the district court conducted a trial. Although on September 29, 2005, the district court had sustained Brian's motion to dismiss Leslie's application for modification constituting her third request to permanently remove Amber from Nebraska, and although the record does not indicate that Leslie ever filed any subsequent pleading requesting permanent removal of Amber, it is apparent that the trial was specifically on Leslie's request for permanent removal and Brian's counterclaim for a change in custody. During the trial, a number of witnesses were called. For ease of presentation, we set forth the relevant testimony by way of the "template" for analyzing removal cases set forth in our opinion in *Wild I.*

## (a) Legitimate Reason for Removal

Considering Leslie's third request for permanent removal of Amber from Nebraska, it appears that Leslie's purportedly legitimate reasons for removal at the time of trial concerned Amber's educational opportunities and her own employment opportunities. Although Leslie did not plead any employment opportunity as a material change in circumstances and did not have a new employment opportunity until several months after she filed her third request to permanently remove Amber, her testimony at trial suggests that she was attempting to establish such as a reason for allowing permanent removal. To that end, Leslie presented evidence in the form of her own testimony, an Omaha area human resources director's testimony, and Amber's testimony.

### (i) Educational Opportunity for Amber

Leslie alleged in her application that she had enrolled Amber in a school with a traditional school year calendar, rather than the year-round calendar that was discussed in our opinion in *Wild I*. Leslie testified that Amber's school in Ohio is "a very good school" and is located approximately 3 miles from their home. Leslie testified that Amber rides a bus to get to school in Ohio, leaving at 6:55 or 7 a.m. and returning home at approximately 3 p.m. Leslie does not get home from work until approximately 4:30 or 4:45 p.m., and she leaves Amber unsupervised at home in the interim between Amber's arrival at home and Leslie's.

Leslie's and Brian's respective attorneys did not ask Amber, who was 11 years old at the time of trial, questions about the quality of the school in Ohio. Amber testified, in response to questioning by Brian's attorney, that she was receiving special help with her reading disorder from teachers at her school in Nebraska. Amber also testified, in response to questioning by Brian's attorney, that she was not receiving a very good grade in reading at her school in Nebraska, but that she was getting mostly "As and Bs" in her other classes.

Although Leslie's attorney did not elicit any testimony from Amber about the quality of her school in Ohio, the court did question Amber about it. The court stated to Amber, "I'm going

to let you measure the school systems for me." The court then asked Amber, "Do you feel you're getting a better education at one than the other?" Amber answered that she thought she was getting a better education in Ohio and explained that she thought such "[b]ecause [she had]· a special class there for reading and it's an easier class than [she] had here." When the court asked Amber to explain whether she meant the class was "easier"· or "more helpful," Amber testified that "[i]t's more helpful and easier." There was no evidence presented to indicate how the "special class" in Ohio compares to or differs from the "special help" provided in Nebraska to address Amber's reading disorder.

### (ii) Employment Opportunity for Leslie

Leslie testified that prior to April 2004, which is when Leslie filed her second request for permanent removal, she had been employed as a civil service employee at "the Defense Finance and Accounting Service" at Offutt (DFAS). She had been employed as a "security manager" and had been earning approximately $40,000 per year. In April 2004, however, Leslie was offered and accepted a job in Dayton, and she voluntarily terminated her employment with DFAS. Leslie made that employment decision and took that action prior to being granted permission from the court to remove Amber from Nebraska. We noted· in *Wild I* that Leslie's employment in Ohio paid approximately $7,000 per year more than her position at DFAS.

As noted in our opinion in *Wild I*, Leslie had asserted in support of her second request for permanent removal of Amber from Nebraska that there was rumor and speculation concerning the future of DFAS. In the June 2006 trial, Leslie testified that DFAS is now, since May 2005, on a list compiled by a "Base Realignment and Closing Commission" and is scheduled to be closed in February 2008.

Leslie's testimony establishes that since the trial and the district court's grant of removal in *Wild I*, she has again changed employment. Leslie testified that she was contacted by a new employer in October 2004, but that she did not receive an offer until "the fall of 2005" and did not begin her new employment until January 2006. As such, it is apparent that

this new job is not the employment that Leslie pled as a legitimate reason for removal in her application for modification filed on August 5, 2005, as she did not have this employment when she made her third request for permanent removal of Amber from Nebraska.

Nonetheless, Leslie testified that her new employment paid her approximately $70,000 per year and afforded insurance benefits. Beyond stating that she had been promoted after 19 months and explaining that such promotions do not "happen very often," Leslie did not testify about career advancement opportunities associated with the new job. The evidence indicates that her new job is a position that is terminable at will, however. An Omaha area human resources director testified that at-will employment provisions are "[a]bsolutely not" uncommon.

The human resources director testified that she is a director of human resources for a defense contractor in the Bellevue area. She confirmed that DFAS was scheduled to close and that civil service employers are not obligated to find a new position for employees if the civil service office closes or moves. She also testified that the cost of living is approximately 9.61 percent higher in Dayton than in Omaha. Finally, she testified that Leslie's employment skills are in a very specific area in program security and that "those jobs are far and few between [sic]" in the Omaha area and would likely be limited to positions with government contractors. She did not indicate the likelihood of Leslie's being able to secure a position with a government contractor in the Omaha area, and she did not testify about her knowledge of the civilian job market in the Omaha area. She did testify that if Leslie sought employment in the "civilian" sector in the Omaha area, Leslie "would probably be able to get maybe an executive administrative position" and "be able to make maybe [$50,000]."

### (b) Amber's Best Interests

Both Leslie and Brian provided evidence concerning the various factors of the best interests analysis detailed in our opinion in *Wild I*. Consistent with our organization of the testimony at trial, we continue to follow the template from that opinion.

### (i) Each Parent's Motives

Leslie did not specifically testify about her motives for seeking, for a third time, to permanently remove Amber from Nebraska. She did testify about the employment opportunity she obtained after she filed this request for permanent removal, however. Similarly, Brian did not specifically testify about his motives for resisting removal. He did testify about his relationship with Amber, however.

### (ii) Quality of Life Factors

#### a. Emotional, Physical, and Developmental Needs

There was no evidence presented to indicate that either party in this case is incapable of or deficient in any way in providing for Amber's emotional, physical, and developmental needs.

#### b. Amber's Opinion or Preference

Leslie testified that Amber had said in April 2006 that she no longer wished to stay in Nebraska. Leslie acknowledged that Amber had testified in a deposition in May that she "didn't care" whether she lived in Ohio or Nebraska.

Amber testified at trial that she wants to live with Leslie. Amber testified, "I think it's a good choice because, uhm, I think I'll be safer there than here." Amber testified, "I think — I think I'm safer with my mom than my dad sometimes." Amber testified, "It's just a feeling that I get sometimes." She provided no further explanation for her desire to reside with Leslie, and she was not specifically asked if she preferred Ohio to Nebraska.

#### c. Enhancement of Income or Employment

As noted above, Leslie presented evidence concerning her new employment in Ohio. The new employment was not pled as a reason why Amber's best interests would be served by permanent removal, because the new employment postdated Leslie's third request for permanent removal of Amber from Nebraska; but evidence was adduced about Leslie's higher income, about the status of her previous job at DFAS, and about one human resources director's opinion concerning the Omaha area job market.

### d. Housing or Living Conditions

Leslie testified that her new housing in Ohio was in a three-bedroom duplex, with both a frontyard and backyard. Leslie testified that there is also a park "just a little ways up the road." There was no evidence presented this time concerning where Leslie and Amber would live if they remained in Nebraska, but we noted in our opinion in *Wild I* that Leslie had previously lived in a large apartment in Nebraska.

### e. Educational Advantages

As we noted in our opinion in *Wild I*, Amber suffers from a learning deficiency and requires special educational opportunities to benefit her reading difficulties. As discussed above, the record indicates that Amber was receiving special attention at the schools in both Ohio and Nebraska to help her with her reading difficulties. Additionally, Brian testified that he had spoken with a school counselor, and had "team meetings" with Amber's English, reading, and special education teachers and the school's director of special education, to discuss Amber's reading difficulties. There is nothing in the record to indicate that Amber was not receiving appropriate attention for her reading difficulties in both Ohio and Nebraska.

### f. Relationship Between Child and Parents

As was true in *Wild I*, there was no specific evidence presented to indicate that Amber had a stronger relationship with either parent. The record indicates that Amber still has a good relationship with both parents.

### g. Ties to Community and Extended Family

As was true in *Wild I*, the record indicates that Amber has no other family in Ohio, but has some extended family here in Nebraska, including one of Leslie's brothers, his wife, and their children. The record in this case indicates that in Nebraska, Amber attends school with one of her cousins, but that she does not have a significant relationship with that cousin outside of the school setting.

The record indicates that Amber's half sister, Andrea Wild, is also in the community in Nebraska. Leslie alleged in her application to modify that a material change of circumstances

was that Andrea was no longer residing in Brian's home and was now under the jurisdiction of the juvenile court in Nebraska. The record indicates that Andrea is still in the Omaha area, residing at Girls and Boys Town, and that she still has regular contact with Brian and Amber. Specifically, Brian testified that Andrea regularly returns to his home for visits, including overnight visits, and that Andrea and Amber are still very close. Amber also testified that she spends time with Andrea frequently, indicating that she had "lost count" of how much time she had spent with Andrea between December 2005 and the trial date in June 2006. No evidence was presented concerning the reason for Andrea's placement at Girls and Boys Town or about the expected length of such placement; Brian testified that "the plan [is] to try to get [Andrea] back living with [him]."

### h. Hostilities Between Parents

The record again indicates that the parties have experienced some disagreements and some communication problems. However, neither party specifically testified about hostilities between them or about any such hostilities' impacting Amber.

### (iii) Impact of Move on Contact Between Child and Noncustodial Parent

Neither party presented specific evidence concerning the impact of permanent removal on the relationship between Brian and Amber. There was evidence presented about visitation, both physical and by telephone. In our opinion in *Wild I*, we noted that there was, in that case, uncertainty about whether Amber would be attending a school in Ohio with a traditional school calendar or a school with a year-round calendar, and it was impossible to determine what kind of extended summer visitation might be available to Brian. As noted above, Leslie testified this time that Amber's school in Ohio is on a traditional school calendar.

### 4. VISITATION ISSUES

In addition to the evidence presented on the specific issue of permanent removal, the parties adduced testimony concerning visitation issues and communication problems between the parties. We feel compelled to discuss some of this testimony,

as it helps to understand the posture of this case at trial and provides a more complete picture of Leslie's third request for permanent removal of Amber from Nebraska. Leslie's attorney elicited testimony concerning alleged visitation problems, specifically concerning spring break and Memorial Day weekend in 2006 and concerning telephone visitation. Brian's attorney also elicited testimony on these issues.

With respect to spring break visitation, Leslie testified that she had written Brian a letter indicating she "would be in Nebraska Saturday to pick [Amber] up," that she called Brian's cellular telephone on Friday "when [she] was driving in [from Ohio]," and that Brian told her she could not have Amber for spring break visitation until Monday "because spring break didn't start until Monday." Leslie picked Amber up on Monday, returned to Ohio, and then returned to Nebraska the next weekend and returned Amber to Brian on Sunday morning. Brian testified that "according to the agreement" in effect, Leslie could have visitation with Amber "either spring break or Easter," and that he first heard from Leslie that she desired to have Amber over spring break when he received a certified letter on the Friday before spring break was to begin. Brian testified that he had no problem with Leslie's taking Amber over spring break, but that because he had not heard anything from Leslie indicating that she desired to exercise visitation over spring break instead of Easter, he had purchased tickets for Amber to see a Broadway production in Omaha on the Sunday before spring break week.

With respect to Memorial Day weekend visitation, Leslie testified that she expressed a desire to Brian the first week of May 2006 to exercise some visitation with Amber over Memorial Day weekend. Leslie testified that she received a message on her cellular telephone from Brian in response, but that she accidentally deleted the message and had to contact Brian again; she then received another message from Brian indicating that Brian and Amber had plans over Memorial Day weekend. Brian and Amber had made plans to visit Brian's parents in Colorado. Brian testified that he heard from Leslie that because he and Amber had plans to visit family in Colorado, she did not want visitation over Memorial Day weekend after all.

Finally, Leslie testified about her telephone visitation with Amber while Amber was residing in Nebraska with Brian. Leslie testified that she talked to Amber "[p]robably four, five times a week" on the telephone. Leslie testified that she placed telephone calls to Amber and Amber placed telephone calls to her. Leslie testified that when she called Amber, Brian would put Amber on the telephone if she was in the house when Leslie called, and that if Amber was not in the house, Brian "would tell [Leslie] that she's outside." Leslie testified that when that happened, Amber would not call her back. Leslie testified, however, that she did not ask Brian to have Amber call back, and, rather, that she would "say good-bye, and [would] call back [later]."

### 5. DISTRICT COURT ORDER GRANTING PERMANENT REMOVAL

On July 11, 2006, the district court entered an order granting Leslie permission to permanently remove Amber from Nebraska, again. In that order, the district court made no finding about what, if anything, constituted a legitimate reason for Leslie to remove Amber from Nebraska, as we noted as a threshold requirement to granting removal in our opinion in *Wild I*. The district court also made no findings concerning the motives of the parents in seeking or resisting removal or the impact of removal on the relationship between Brian and Amber, as noted as factors to be considered in our opinion in *Wild I*. Instead, the district court addressed what it characterized as "quality of like [sic] issues," "the best interest of the child issues," and issues that constitute the considerations under the quality of life factor of the best interests analysis we set forth in our opinion in *Wild I*.

The district court found that the enhancement of income or employment consideration weighed in favor of removal. The court noted that Leslie had "now changed her employment at a substantial increase in salary" and that "[t]he evidence further clearly now shows that her job at [DFAS], if she were able to be rehired, would be eliminated no later than 2008, with no guarantee of transfer and clearly not at her current salary."

The district court found that the educational advantages consideration weighed in favor of removal. Specifically, the

court relied on Amber's "testi[mony] that in her opinion the school she attended in Ohio offered her more opportunities and she had more specific individualized help in areas she was having problems with."

The district court combined the quality of the relationship between Amber and her parents consideration and the opinion or preference of Amber consideration for purposes of discussion. The court acknowledged that Amber had a good relationship with both parents. The court found, however, that Amber's testimony requesting that she be permitted to live with Leslie "weighs heavily in favor of removal."

The district court found that the ties to the community and extended family consideration "is now neutral on removal." The court acknowledged that Amber has friends in both Nebraska and Ohio, but placed no greater need upon maintaining one set of friends than it placed upon maintaining the other. The court also recognized that one of Leslie's brothers and his family still reside in the Omaha area, and it acknowledged that Amber's half sister, Andrea, is still in Omaha and that Amber and Andrea still have a close bond. However, the court emphasized the fact that Andrea is now at Girls and Boys Town in Omaha, instead of in Brian's home, and that Amber's and Andrea's "contacts with each other have now been limited."

With respect to the hostility between the parents consideration, the district court made no specific conclusion about whether it weighed in favor of removal. The court recognized that "there is still significant hostility between [Leslie] and [Brian]." The court found, however, that Leslie "has made every effort to minimize [the hostility] by her actions" and "has made every attempt to do what is in the best interest of Amber." The court also indicated that "[i]t is very evident to th[e] Court which parent would be more inclined to allow the other parent parenting time and access to Amber, and that is [Leslie]."

The district court found that the other quality of life considerations were "balanced" or "neutral" and did not weigh in favor of removal. The court found, however, that considering all of the evidence, it was "in the best interest of Amber that the Application for Removal now be granted." The court then set forth a visitation schedule, including "telephonic visitation

a minimum of two times per week"; ordered Brian to pay child support; and ordered each party to pay his or her own attorney fees. The court dismissed Brian's counterclaim for a change of custody. This appeal followed.

### III. ASSIGNMENTS OF ERROR

Brian has assigned, inter alia, that the district court erred in granting Leslie's motion for temporary removal of Amber from Nebraska, in granting Leslie's third request for permanent removal of Amber from Nebraska, in setting Brian's visitation rights, in setting Brian's child support obligation, in denying Brian's request for a change of custody, and in denying Brian's request for attorney fees.

### IV. ANALYSIS

#### 1. STANDARD OF REVIEW

Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002); *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002); *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002); *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000); *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999); *Wild I*. A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *McLaughlin v. McLaughlin, supra; Brown v. Brown, supra; Wild I*. See, *Vogel v. Vogel, supra; Jack v. Clinton, supra; Farnsworth v. Farnsworth, supra*.

#### 2. TEMPORARY REMOVAL OF AMBER FROM NEBRASKA

Brian first asserts that the district court erred in granting Leslie's motion for temporary removal of Amber from Nebraska. Brian argues that the court erred in granting the motion and in

not setting forth any reasons supporting granting the motion or supporting a conclusion that granting the motion was in Amber's best interests. We agree that the court erred in granting this motion, but we also agree with Leslie that no relief may be provided for this error.

In *Jack v. Clinton*, 259 Neb. at 210, 609 N.W.2d at 336, the Nebraska Supreme Court specifically addressed, in a section with a subheading that reads, "Temporary Removal Prior to Ruling on Permanent Removal Discouraged," the unnecessary and unfortunate complications that arise when a trial court grants a motion for temporary removal of a minor pending resolution of an application for permanent removal. In addition to necessarily causing the record to include facts pertaining to the periods prior to and after relocation, an ultimate denial of the application for permanent removal will necessitate ordering the minor, who may have already recently adjusted to one move, to move again and return to the jurisdiction. See *id.* The Supreme Court held, "The grant of temporary permission to remove children to another jurisdiction complicates matters and makes more problematic the subsequent ruling on permanent removal and encumbers appellate evaluation of the ultimate decision on permanent removal." *Id.* at 210, 609 N.W.2d at 337. As such, the Supreme Court specifically "discourage[d] trial courts from granting temporary permission to remove children to another jurisdiction prior to a ruling on permanent removal and *instead* encourage[d] them to promptly conduct a full hearing on permanent removal." *Id.* at 210-11, 609 N.W.2d at 337 (emphasis supplied).

We disagree with Leslie's argument on appeal that *Jack v. Clinton* "does not prohibit the temporary removal of a child in a pending trial on [the] issue [of permanent removal], it merely directs the trial court's [sic] that if the temporary removal is granted . . . the trial court should '. . . promptly conduct a full hearing on permanent removal.'" Brief for appellee at 28. We do not believe that the Supreme Court's comments in *Jack v. Clinton* can be read to suggest that granting temporary removal is acceptable so long as a full hearing is promptly conducted. Rather, we read the Supreme Court's comments in *Jack v. Clinton* as recognizing the unnecessary complications that are

caused by allowing temporary removal pending a ruling on an application for permanent removal.

In the present case, the district court was provided with a motion for temporary removal of Amber 2 days after the district court made a docket entry acting on this court's reversal of the district court's improper grant of Leslie's second request for permanent removal of Amber from Nebraska. Doing so was directly contrary to the Supreme Court's discouragement on this very issue in *Jack v. Clinton*. Nonetheless, inasmuch as the order was a temporary order, we agree with Leslie that no relief can now be afforded to Brian for this improper ruling by the district court.

### 3. PERMANENT REMOVAL OF AMBER FROM NEBRASKA

Brian next asserts that the district court erred in granting Leslie's third request to permanently remove Amber from Nebraska. We find that Leslie again failed to carry her burden to demonstrate a legitimate reason for removing Amber from Nebraska, in that none of the grounds for removal alleged in Leslie's application constitute a legitimate reason for removing Amber. We further find that Leslie again failed to carry her burden to demonstrate that allowing removal would be in Amber's best interests, because the record fails to demonstrate that Ohio provides benefits to Amber under the various factors considered in the best interests analysis. As a result, we conclude, on the record provided, that the district court again abused its discretion in allowing Leslie to remove Amber to Ohio.

■ The relevant test to be applied in cases where a custodial parent seeks court permission to remove a minor child from the state has been set forth by the Nebraska Supreme Court on numerous occasions. See, *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002); *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002); *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002); *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000); *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999); *Wild I.* In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the

custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id.* Under Nebraska law, the burden has been placed on the custodial parent to satisfy this test. See *Brown v. Brown, supra.*

### (a) Legitimate Reason to Leave State

Leslie did not specifically assert in the pleading comprising her third request to permanently remove Amber from Nebraska that there existed a legitimate reason to leave Nebraska. Leslie asserted that "there ha[d] occurred a material and significant change in circumstances" that supported removing Amber from Nebraska, and she asserted a number of such alleged changes in circumstances, including (1) that DFAS had been placed on a base closing list; (2) that Andrea, Amber's half sister, had been placed in a setting other than Brian's home; (3) that Amber was enrolled in a school in Ohio that operated on a traditional school year calendar; and (4) that Amber had attended school in Ohio during the 2004-05 school year pursuant to the district court's prior grant of Leslie's second request for permanent removal of Amber. Leslie's third request to permanently remove Amber included no mention of any employment opportunities for Leslie as a reason for leaving Nebraska, beyond noting in passing that she had originally moved to Ohio "for a much better paying position with greater opportunity for advancement."

As noted above, the district court made no finding concerning whether Leslie had demonstrated a legitimate reason for leaving Nebraska. Despite our indication in *Wild I* that such is a threshold matter for the court to determine prior to evaluating the best interests factors, the court failed to address the legitimate reason element in even a cursory fashion. As such, our review of the court's decision to grant removal is made more difficult by not knowing which, if any, of the alleged material changes in circumstances the court deemed to constitute a legitimate reason for removal. It appears likely that, as the parties argue on appeal, the court implicitly believed that Leslie's newest career opportunity was the legitimate reason for removal, despite that career opportunity's not being pled and, in fact, not existing at the time Leslie filed her third request for permanent removal of Amber.

#### (i) Potential Reasons Pled by Leslie

None of the alleged material changes in circumstances pled by Leslie constitute a legitimate reason for permanently removing Amber from Nebraska. The status of DFAS is not relevant to the present inquiry, and neither Andrea's placement outside of Brian's home nor Amber's enrollment in school in Ohio constitutes a legitimate reason for leaving Nebraska.

As we noted in our opinion in *Wild I*, in granting Leslie's second request for permanent removal of Amber the district court placed significant emphasis on the fact that Leslie's position in Nebraska at DFAS was subject to potential reassignment or relocation. The evidence in that case indicated a "rumor" that Leslie's position at DFAS was going to be eliminated and a possibility that she could be reassigned or relocated by the military. However, by the time of trial in that case, Leslie had already voluntarily terminated her employment with DFAS, had accepted a job in Ohio, and had moved from Nebraska.

In the present case, Leslie presented evidence that DFAS has now been placed on an official base closing list and that DFAS is scheduled to be closed in 2008. Leslie also presented evidence that when a civil service employer, such as DFAS, closes or relocates, there is no obligation by the employer to provide or obtain other employment for the employee.

We find that the status of DFAS now is irrelevant to the discussion of whether Leslie has demonstrated a legitimate reason for leaving Nebraska. Prior to receiving permission to remove Amber in the trial which led to the appeal in *Wild I*, Leslie voluntarily terminated her employment with DFAS. There is no evidence to indicate that Leslie could return to DFAS, in Nebraska, even if she wanted to. As such, because DFAS is no longer Leslie's employer, nor is there evidence indicating that she could return to DFAS, the future status of DFAS has no impact on Leslie or her employment opportunities. Whether DFAS continues to operate forever or closes tomorrow, it will have no impact on Leslie, because of her voluntary decision to terminate her employment with DFAS prior to being granted relief by the trial court as recounted in *Wild I*.

Andrea's placement outside of Brian's home does not provide a legitimate reason for Leslie to leave Nebraska, either.

The record contains no evidence concerning the reason for Andrea's being placed at Girls and Boys Town in Omaha. Further, contrary to the district court's explicit finding in its order granting removal, the record does not indicate how long Andrea will remain placed outside of Brian's home; Brian's testimony actually indicated that "the plan [is] to try to get [Andrea] back living with [him]." The fact that Andrea is not now currently living with Brian has no bearing on whether Leslie has a legitimate reason to leave Nebraska. This fact may have a bearing on the best interests analysis, as discussed below.

Similarly, Amber's enrollment in school in Ohio cannot be considered a legitimate reason for removal. Although one factor in our best interests analysis in *Wild I* was that Leslie had not enrolled Amber in school in Ohio and it was unclear whether school there would be on a traditional or a year-round calendar, the fact that Amber is now enrolled in a school with a traditional calendar does not provide a legitimate reason for leaving Nebraska. This fact may have a bearing on the best interests analysis, as discussed below.

Finally, the fact that Amber attended school in Ohio during the 2004-05 school year cannot be considered a basis for finding a legitimate reason to leave Nebraska. Amber attended school in Ohio during that school year because the district court incorrectly granted Leslie's second request to permanently remove Amber from Nebraska. It would be incongruent to allow such an incorrect ruling to form the basis for a third request to permanently remove Amber.

### (ii) Leslie's New Employment

Although Leslie did not plead it as a material change in circumstances, it is apparent from a reading of the record and the briefs on appeal that Leslie's newest employment opportunity might also be considered a legitimate reason for leaving Nebraska. Leslie did not begin the new employment until January 2006, so it was not even in existence when Leslie filed her third request to remove Amber from Nebraska. Nonetheless, the new employment was in existence at the time of trial.

Legitimate employment opportunities for the custodial parent may constitute a legitimate reason for leaving the state. *Wild I.* See, *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70

(2000); *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999); *Carraher v. Carraher*, 9 Neb. App. 23, 607 N.W.2d 547 (2000). Such legitimate employment opportunities may constitute a legitimate reason "where there is a 'reasonable expectation of improvement in the career or occupation of the custodial parent.'" *Farnsworth v. Farnsworth*, 257 Neb. at 252, 597 N.W.2d at 600, quoting *Gerber v. Gerber*, 225 Neb. 611, 407 N.W.2d 497 (1987). See, also, *Jack v. Clinton, supra.* Such legitimate employment opportunities may constitute a legitimate reason "where the custodial parent's new job include[s] increased potential for salary advancement." *Id.* at 205, 609 N.W.2d at 333. See, also, *Farnsworth v. Farnsworth, supra.*

As we noted in our opinion in *Wild I*, the Nebraska Supreme Court found in *Jack v. Clinton, supra,* that the custodial parent had met the threshold requirement of proving a legitimate reason for leaving Nebraska and removing the minor children to Pennsylvania. In that case, the evidence included testimony that the new employment opportunity in Pennsylvania offered greater potential for salary advancement, required less overtime, and allowed the custodial parent to spend more time with the minor children. In addition, the custodial parent provided evidence that a significant additional reason for moving from Nebraska to Pennsylvania was to be closer to extended family.

Similarly, in *Farnsworth v. Farnsworth, supra,* the custodial parent met the threshold requirement of proving a legitimate reason for leaving Nebraska and removing the minor child to Colorado. In that case, the custodial parent presented evidence that she had conducted an unsuccessful search for better employment in Nebraska and, having failed, obtained a job in Colorado that provided greater income, benefits, and career advancement potential than her employment in Nebraska.

The present case is, in some significant ways, distinguishable. The entirety of Leslie's testimony on direct examination concerning her new employment was that she was contacted by the employer in October 2004, that she first received an offer in the fall of 2005, that she accepted in December 2005, that she began in January 2006, that her salary was approximately

$70,000 per year, that she worked a 40-hour week, and that she had health and dental insurance, but that Amber was not covered by her insurance. On cross-examination, Leslie testified that she does not generally work any overtime, except in the case of an emergency situation.

Leslie presented no evidence concerning any attempts to determine whether there was comparable employment available in Nebraska. She presented the testimony of a human resources director from a defense contractor, but that witness did not testify to or indicate any knowledge about the job market in Nebraska outside of her field of defense contracting. Additionally, Leslie presented no evidence concerning possibilities for career advancement, future salary increases, or whether benefits would be available for Amber. Leslie presented no evidence to compare the amount of time she is able to spend with Amber now to either what she was able to spend with Amber during her former employment in Nebraska or what she may be able to spend during any other employment that might be available in Nebraska. The only evidence in this regard indicated that in Ohio, Amber spends between 1½ and 2 hours at home unsupervised after school before Leslie returns home from work. Finally, the record indicates that there is no extended family in the area to buttress Leslie's new employment as a legitimate reason.

The most that can be gleaned from the record about Leslie's new employment is that she makes more money than she did during her former employment in Nebraska, and more than the defense contractor human resources director opined Leslie could make as an executive administrative assistant in Nebraska. We think it important that this new employment was not even in existence at the time Leslie filed her third request to permanently remove Amber and was clearly not a basis for her request to remove Amber. We also iterate that the district court made no finding about whether this constituted a legitimate reason, or the legitimate reason, for allowing removal. Nonetheless, in light of the financial benefit apparent from the new employment, we conclude that this employment could constitute a legitimate reason for leaving Nebraska.

### (b) Amber's Best Interests

As noted, we conclude that Leslie failed to demonstrate that any of the pled alleged changes in circumstances constituted a legitimate reason for leaving Nebraska. We further conclude that even if the employment opportunity Leslie secured after filing her application could be considered a legitimate reason for leaving Nebraska, Leslie further failed to meet her burden to prove that removal from Nebraska is in Amber's best interests, because the evidence adduced by Leslie does not indicate that the relevant factors weigh in favor of Ohio over Nebraska.

 After clearing the threshold of demonstrating a legitimate reason for leaving the state and removing the minor child to another state, the custodial parent must demonstrate that it is in the child's best interests to continue living with him or her. *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002); *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002); *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002); *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000); *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999); *Wild I*. In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation. *Id.*

In our opinion in *Wild I*, we noted that the district court had not elaborated on any of the best interests factors or given any indication of why the court had determined that it was in Amber's best interests to be removed from Nebraska. We then discussed, in great detail, each factor and consideration that should be considered in evaluating the child's best interests. In the present case, the district court, for some reason, "grouped" the various factors and considerations "in two basic categories" and indicated that "[o]ne is quality of like [sic] issues, and the other [is] the best interest of the child issues." The court then discussed only the quality of life factor set forth in our opinion in *Wild I* and did not address either of the other

factors before concluding that the court "finds it to be in the best interest of Amber that the Application for Removal now be granted." We find that the evidence, again, does not support this conclusion.

### (i) Each Parent's Motives

The first factor that must be considered is each parent's motives for seeking or opposing the removal of the minor child from the jurisdiction. We conclude that at most, the evidence demonstrates that the parties' motives are balanced; this factor does not weigh in favor of a finding that removal is in Amber's best interests.

■ The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *McLaughlin v. McLaughlin, supra*; *Wild I*. See, also, *Vogel v. Vogel, supra*; *Brown v. Brown, supra*; *Jack v. Clinton, supra*; *Farnsworth v. Farnsworth, supra*.

The evidence in the present case indicates that Brian is an involved noncustodial father who has regularly exercised his visitation and who willingly took custody of Amber by agreement of the parties between December 2005 and trial. On the other hand, we found in *Wild I* that Leslie was motivated to seek removal to be nearer her fiance and to explore a different employment opportunity. In this case, the evidence indicates that Leslie is no longer in a relationship with the man who was described as her fiance in *Wild I* and has left the employment opportunity described in *Wild I*. Two days after the district court made a docket entry acting on the mandate reversing the prior grant of permission for permanent removal, Leslie filed a third request for permanent removal, and she took Amber back to Ohio prior to receiving any authorization from the court to do so. Although it appears that Leslie is still motivated by yet another employment opportunity, it is difficult to conclude that such opportunity was a motivating factor for Leslie to seek removal, because she did not have the current employment opportunity until approximately 5 months after she filed her third request to permanently remove Amber.

As is true of the other cases decided by the appellate courts of Nebraska concerning this factor, we do not find that either

party was acting in bad faith or with ill motives. See, *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002); *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002); *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002); *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000); *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). We conclude that at most, the motives of the parties are balanced. As such, this factor does not weigh in favor of a finding that it is in Amber's best interests to be removed from Nebraska.

### (ii) Quality of Life

The second factor that must be considered is the potential that the move holds for enhancing the quality of life for the child and the custodial parent. This factor requires an analysis of a number of other considerations which bear upon the potential enhancement of the child's quality of life. The evidence in the record in this case fails to demonstrate that the proposed removal from Nebraska will significantly enhance Amber's quality of life. Leslie failed to adduce sufficient evidence to support a finding that this factor weighs in favor of removal.

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the removal would antagonize hostilities between the two parties. *Wild I.* See, *McLaughlin v. McLaughlin, supra*; *Vogel v. Vogel, supra*; *Brown v. Brown, supra*; *Jack v. Clinton, supra*; *Farnsworth v. Farnsworth, supra*. This list should not be misconstrued as setting out a hierarchy of considerations, and depending on the circumstances of a particular case, any one consideration or combination of considerations may be variously weighted. *Id.*

## a. Emotional, Physical, and Developmental Needs

As in *Wild I*, the record indicates that both parties in this case are capable of providing for the emotional, physical, and developmental needs of Amber. The record suggests that both are loving parents genuinely concerned about Amber's needs. There was no evidence presented to suggest that either party is incapable of or deficient in any way in providing for Amber's emotional, physical, and developmental needs. As such, this consideration is equally balanced and does not weigh in favor of removal.

## b. Amber's Opinion or Preference

At the time of trial in this matter, Amber was 11 years old. Amber testified that she wants to live with Leslie. Although Amber's preference is entitled to some weight in favor of removal, we disagree with the district court's conclusion that this factor "weighs heavily in favor of removal," because we disagree with the court's finding that Amber provided "reasonable and persuasive reason[s] for her decision."

In custody determinations, the desires and wishes of the minor child if of an age of comprehension are entitled to consideration, although they are not controlling. See *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). The Nebraska Supreme Court has recognized this proposition of law is applicable to the child's opinion or preference consideration of the best interests analysis in removal cases. See *id.* The Supreme Court has recognized that in those cases where the child's preference was given significant consideration, the child was typically over 10 years old. See *id.* Additionally, the child's preference is entitled to consideration if the child is of sufficient age and has expressed an intelligent preference. See *id.*

In this case, Amber was asked to tell the judge "where [she wanted] to live." In response, Amber replied, "My mom's." When asked to tell the judge "any particular reason why [she would] like to live with [her] mom," Amber replied, "Uhm, because I think it's, uhm — I think it's a good choice because, uhm, I think I'll be safer there than here." Amber testified, "Yeah, because I think — I think I'm safer with my mom than my dad sometimes." When asked to explain why she felt that way, Amber testified, "It's just a feeling that I get sometimes."

Contrary to the conclusion of the district court, our de novo review of Amber's testimony does not lead us to conclude that Amber "was able to give reasonable and persuasive reason[s] for her decision." Indeed, Amber was not able to explain why she preferred to live with Leslie, other than to indicate "a feeling" that she would be safer; there is nothing in the record to indicate that Amber is in any way unsafe when with Brian. Nonetheless, as we concluded in *Wild I*, we conclude that Amber's preference is entitled to some recognition, and this consideration weighs in favor of removal, albeit not "heavily in favor of removal."

### c. Enhancement of Income or Employment

As fully addressed above in our discussion of Leslie's new employment opportunity, the record in this case does indicate that Leslie has secured another new job, again at a higher income than the last employment she held in Nebraska. Leslie did not present any evidence to directly indicate how her increased income would be beneficial to Amber's best interests. The most that can be said from the record presented is that Leslie now makes more money than she did when she last lived in Nebraska. Although increased income certainly provides the potential for benefits to Leslie, the record does not indicate that Leslie was having difficulty making ends meet in Nebraska, that Amber was in need of anything that Leslie was unable to provide because of her income level in Nebraska, or any other explanation of how Leslie's increased income will benefit Amber. The record does indicate that Leslie's new employment has resulted in her leaving Amber at home alone and unsupervised for 1½ to 2 hours after school every day. Nonetheless, we recognize that the increase in income provides the potential for benefits to Amber, and we conclude that this factor weighs in favor of removal.

### d. Housing or Living Conditions

As we noted in our opinion in *Wild I*, Leslie's last housing in Nebraska was in a large apartment. In the present case, Leslie testified that her housing in Ohio was in a duplex. She testified that the neighborhood consisted of rented duplexes and houses and that there was a park "just a little ways up the

road." There was, again, no evidence presented concerning the quality of the neighborhoods for housing in either Nebraska or Ohio, and there was, again, no evidence presented to indicate that the housing in Ohio will provide any benefit to Amber's best interests. There was no evidence presented to indicate that the available housing in Nebraska was in any way deficient or that the current housing in Ohio was in any way superior. This consideration does not weigh in favor of removal.

### e. Educational Advantages

In the present case, Brian testified that Amber's school here in Nebraska tested and evaluated Amber after she enrolled, to facilitate Amber's reading education. Brian testified that he spoke with a school counselor and the director of special education at Amber's school, and Brian stated that he had participated in "team meetings" with a special education teacher, Amber's reading teacher, and at least one other teacher concerning her progression. Brian testified that it was decided Amber was not falling behind her peers and that she was kept in class with the other students and progressed on to seventh grade. Amber testified that she was receiving special help from her teachers in Nebraska with reading.

Leslie specifically testified that she could not testify about any educational advantages that Amber might enjoy by being in the Ohio schools over the schools in Nebraska. Leslie testified that in Ohio, Amber was in a special reading and English class and a special math class.

The district court appeared to recognize that Leslie had not provided sufficient evidence to indicate that the Ohio schools afforded an educational advantage over the Nebraska schools, as the court asked Amber to "measure the school systems" for the court. In response to the court's question about where Amber felt she was getting a better education, Amber testified, "I think I'm getting a better education in Ohio." Amber elaborated by indicating that she felt that way "[b]ecause [she has] a special class there for reading and it's an easier class than [she] had [in Nebraska]." When the court asked Amber if she meant that the class was "easier or . . . more helpful," Amber answered, "It's more helpful and easier."

Reviewing the record de novo, we find that Leslie failed to demonstrate that removal to Ohio afforded Amber any significant educational advantages. In both locations, Amber was receiving special assistance for her reading, and Leslie was not able to testify about any educational advantages. We do not find that 11-year-old Amber's testimony that the Ohio school was providing her a better education because it was "easier" significantly tips the balance on this consideration. This consideration does not weigh in favor of removal.

### f. Quality of Relationship Between Child and Parents

With regard to this consideration, the record in the present case, like the record in *Wild I*, indicates only that Amber has a good relationship with both parties and that by necessity, removal will impact her relationship with Brian and the amount of time she is able to spend with Brian. In this trial, as in the trial in *Wild I*, there was no evidence presented to indicate that Amber has a stronger relationship with either parent. There was again no expert evidence produced indicating that removal should be allowed because of a stronger bond with Leslie. Compare *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002) (expert recommended granting removal because of bond with custodial parent). As in *Wild I*, it is clear that Amber's relationship with Brian will suffer, at least to the extent of a reduction in time spent together and in the frequency and ease of Amber's and Brian's contact with each other. This consideration, then, also does not weigh in favor of removal.

### g. Ties to Community and Extended Family

As in *Wild I*, there was again little evidence presented concerning Amber's ties to either community. The record again indicates that Amber has some extended family in Nebraska. Specifically, one of Leslie's brothers, his wife, and their children are in the community in Nebraska. The record indicates that Amber does not have significant contact with this family outside of school, but that when she attended school in Nebraska, she did attend school with one of her cousins. The record again indicates that there is no extended family in Ohio.

Still of importance is the fact that Amber's half sister, Andrea, is located in the community in Nebraska. The district

court concluded that Andrea no longer resides with Brian and is now placed at Girls and Boys Town. The district court further found "from the evidence" that Andrea "will remain [at Girls and Boys Town] until she reach's [sic] the age of majority, with visits at home." We find no support in the record for this conclusion.

Instead, the record indicates that Andrea is currently living at Girls and Boys Town. There is no evidence in the record to indicate what prompted Andrea's placement at Girls and Boys Town, but the record does indicate that Andrea still has overnight visitation in Brian's home and that Amber and Andrea had frequent contact while Amber was back in Nebraska. Amber testified that she had so much contact with Andrea that she had "lost count" of the number of times they had seen each other.

The district court concluded that "the weight of this issue is now neutral on removal." We disagree. The record indicates that Amber has extended family in the community in Nebraska, including a cousin she attended school with and a half sister who is not living with Brian but with whom Amber did have frequent contact. Amber has no extended family in Ohio. The evidence on this consideration is not neutral, and this consideration does not weigh in favor of removal.

### h. Hostilities Between Parties

As in *Wild I*, the record indicates that the parties have experienced some disagreements and some communication problems, but there was no evidence to indicate that any of the hostilities between the parties have adversely affected Amber. The district court held that Leslie "has made every effort to minimize [hostilities] by her actions" and pointed to Leslie's allowing Amber to live with Brian between December 2005 and the trial in the present case. The district court also pointed to the occasion on which Brian "determined spring break to commence on Monday . . . knowing [Leslie] would be [in Nebraska] on Friday." Finally, the district court held that "[i]t is very evident" Leslie "would be more inclined [than Brian] to allow the other parent parenting time and access to Amber" and that "[d]uring the entire proceeding [Leslie] has made every attempt to do what is in the best interest of Amber." Upon our

de novo review, we disagree with the district court's characterization of the record.

The record does not indicate that Leslie has made every effort to minimize hostilities between her and Brian by her actions. The record indicates that we reversed the district court's grant of Leslie's second request for permanent removal of Amber and that the district court made a docket entry on the mandate on August 3, 2005. Two days later, Leslie filed a third request for permanent removal, and then took Amber back to Ohio prior to obtaining any court permission to do so. Brian was left to file a motion seeking enforcement of his visitation rights under the operative court order, the dissolution decree—which granted him overnight visitation on weekends and during the week, as well as other visitation during the week. The district court, rather than recognizing that Leslie had taken Amber to Ohio without court permission, held that Brian had not demonstrated he had physically attempted to exercise those visitation rights and that the decree did not require Leslie to provide transportation.

The record further indicates that we awarded Brian attorney fees as a result of our decision in *Wild I*. When Brian's counsel approached Leslie's counsel about securing payment of the fees, the transcript indicates that Leslie's counsel responded, "The attorney fee is a judgment against [Leslie] and you have the right to avail yourself of any legal remedies to collect the judgment." Leslie testified that she paid the attorney fee award in May 2006—approximately 1 year after the fees were awarded —although Brian testified that she still had not paid the full amount even as of trial in June 2006.

We do not interpret Leslie's actions of taking Amber to Ohio without court permission, filing a third request for permanent removal at a time when there had been no change of circumstances from those litigated in the trial on her second request for permanent removal, and taking nearly 1 year to pay the attorney fee award as making "every effort to minimize [hostilities]." Rather, we interpret those actions as further contributing to the hostilities.

Finally, as fully set forth in our discussion of the background of this case above, the evidence does not indicate that Brian's

actions related to Leslie's request for spring break visitation constituted an attempt to further hostilities between the parties. Rather, contrary to the district court's finding that Brian "attempt[ed] to thwart" Leslie's visitation or its finding that "[h]e determined spring break to commence on Monday . . . knowing [Leslie] would be [in Nebraska] on Friday," Brian testified that "according to the agreement" in effect, Leslie could have visitation with Amber "either spring break or Easter," and that he first heard from Leslie that she desired to have Amber over spring break when he received a certified letter on the Friday before spring break was to begin. Brian testified that he had no problem with Leslie's taking Amber over spring break, but that because he had not heard anything from Leslie prior to the Friday she planned on arriving indicating that she desired to exercise visitation over spring break instead of Easter, he had purchased tickets for Amber to see a Broadway production in Omaha on the Sunday before spring break week.

The district court did not make a specific finding that this consideration weighed in favor of removal. However, it is apparent from the court's characterization of the record—a characterization we disagree with—that the court did find this factor weighed in favor of removal. On our de novo review, our reading of the record indicates that Leslie has not acted to minimize the hostility between the parties, and this consideration does not weigh in favor of removal.

### i. Conclusion on Quality of Life

Our de novo review of the record leads us to conclude that the quality of life considerations do not weigh in favor of allowing Leslie to permanently remove Amber from Nebraska. In the present case, the various considerations almost uniformly fail to weigh in favor of removal. Leslie failed to prove an enhancement in the quality of life for Amber from leaving Nebraska and, at most, established that she is now making more money than she previously did in Nebraska. Because Leslie failed to adduce sufficient evidence to support a finding that Amber's quality of life would be enhanced, we find that this factor weighs against removal.

### (iii) Impact of Move on Contact Between
### Child and Noncustodial Parent

In this case, there can be no doubt that removal will impact the amount of contact between Brian and Amber. Prior to Amber's removal, Brian enjoyed a liberal visitation schedule that included every other weekend, one overnight visitation during the week every week, and one other evening every other week. Instead of being in the same community as Amber and able to have frequent and regular physical contact with her, Brian will be forced to rely upon electronic and telephone visitation and visitation on holidays and summer breaks, and Amber will now be located almost 750 miles away.

Although it is true that the district court granted Brian all but the final 2 weeks of summer vacation and ordered Leslie to bear the costs of transportation, it is apparent that this amount of visitation will still be significantly less than the total amount of time Brian spent with Amber under the visitation order in place under the decree while Amber was residing in Nebraska. Compare *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002) (noncustodial parent still able to enjoy weekend visitation because of short distance of custodial parent's relocation). Although it appears that the district court attempted to minimize the negative impact removal would have on contact between Brian and Amber, the court's attempts do not entirely eliminate that negative impact.

### (iv) Conclusion on Best Interests

The record does not demonstrate sufficient support for the district court's conclusion that it is in Amber's best interests to be removed from Nebraska to Ohio. None of the factors to be considered in evaluating Amber's best interests weighs in favor of allowing removal except Amber's preference and Leslie's enhanced income, as noted above. Leslie failed to adduce sufficient evidence to demonstrate how allowing removal of Amber from Nebraska would serve Amber's best interests. Because Leslie failed to meet her burden of proof on this issue, we conclude that the district court abused its discretion in finding that allowing removal would be in Amber's best interests.

 

### (c) Conclusion on Removal

As we noted of *Wild I* in our opinion in that appeal, this case is another in the growing line of difficult cases in Nebraska courts where a custodial parent seeks the opportunity to leave the state and relocate with a minor child. As was true of the record in *Wild I*, the record in this case does not contain negative evidence about the noncustodial parent, Brian. The record again suggests that Brian is a capable and loving father who has vigorously opposed Leslie's removal of Amber from Nebraska. Leslie began attempting to remove Amber from Nebraska fewer than 10 months after the parties entered into a stipulated settlement agreement, and has continually attempted to do so, despite an inability to demonstrate that doing so is in Amber's best interests.

We conclude, as we did in *Wild I*, that Leslie has failed to adduce sufficient evidence to support the district court's grant of Leslie's request for permanent removal of Amber from Nebraska. The record indicates that Leslie had no legitimate reason for seeking removal in the present case and that the only arguably legitimate reason did not come into existence until several months after Leslie filed her third request. The record indicates that the various factors used to evaluate whether removal is in Amber's best interests do not collectively weigh in favor of allowing removal. The district court again abused its discretion in finding that Leslie had satisfied her burden of proof. We again reverse the district court's order granting Leslie's request to remove Amber from Nebraska.

### 4. Visitation and Child Support

In light of our resolution of Brian's assignment of error concerning the district court's grant of Leslie's third request for permanent removal of Amber from Nebraska, we need not further address the district court's visitation and child support orders that related to such removal.

### 5. Change in Custody

Brian asserts that the district court erred in denying his counterclaim seeking a change in custody. We conclude that Brian has not proven a material change in circumstances showing that

Leslie is unfit or that the best interests of Amber require such action. We find no merit to this assignment of error.

As we noted in our opinion in *Wild I*, the issue of a change in custody must be considered separately and apart from the custodial parent's request to remove the child to another state. Ordinarily, a request for change of custody will not be granted unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. See *Wild I*.

In the present case, as in *Wild I*, Leslie testified that if the court denied her request to remove Amber to Ohio, she would return to Nebraska. Despite Leslie's response to this court's denial of her request in *Wild I*, the record in the present case contains no evidence to demonstrate a material change of circumstances which would warrant changing custody. As such, we find this assignment of error to be without merit.

### 6. ATTORNEY FEES

Finally, Brian asserts that the district court erred in denying his request for attorney fees. The district court ordered each party to pay his or her own fees. We do not find such a determination by the district court to be an abuse of discretion.

The district court's decision on a request for attorney fees is reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion. *Wild I*. There is not sufficient evidence to attribute bad faith or ill motives to either party in this case, and the record does not establish that the district court abused its discretion in ordering each party to pay his or her respective attorney fees. We find this assignment of error to be without merit.

### V. CONCLUSION

We find that the district court again abused its discretion in granting Leslie's request to permanently remove Amber from Nebraska. We find that Leslie failed to meet her burden of proof to demonstrate that the pled reasons for leaving Nebraska constituted legitimate reasons for removal. Even if Leslie's new employment opportunity, obtained several months after she instituted this action, could be considered a legitimate reason for removal, we find that Leslie failed to meet her burden of proof

to demonstrate that removal from Nebraska would be in Amber's best interests. Accordingly, we reverse the district court's order granting permanent removal.

We find no abuse of discretion by the district court with respect to Brian's requests for a change of custody and for attorney fees. Accordingly, we affirm those findings by the district court. We do not further address Brian's assignments of error.

AFFIRMED IN PART, AND IN PART REVERSED.